**UNITED STATES of America, Plaintiff,**

v.

**William O. DOLLAR and Connie Jean Dollar, Defendants.**

**No. CR–97–C–0138–S.**

United States District Court,
N.D. Alabama,
Southern Division.

Oct. 9, 1998.

Albert C. Bowen, Jr., Frederick A. Erben, Beddow Erben & Bowen, Birmingham, AL, for William O. Dollar.

Albert C. Bowen, Jr., Frederick A. Erben, Beddow Erben & Bowen, Birmingham, AL, J. Mark White, White Dunn & Booker, Birmingham, AL, for Connie Jean Dollar.

G. Douglas Jones, U.S. Attorney, Robert O. Posey, U.S. Attorney's Office, Robert S. Vance, Fed. Bldg., U.S. Marshal, U.S. Marshal's Office, U.S. Probation, U.S. Probation Office, Birmingham, AL for U.S. Attorneys.

## MEMORANDUM OF OPINION

CLEMON, District Judge.

This is a firearms case, in which the defendants William O. Dollar and his sister, Connie Jean Dollar, are charged with violating the general conspiracy statute, 18 U.S.C. § 371,[1] and with concealing the identity of

---

1. If two or more persons conspire either to commit an offense against the United States, or to defraud the United States, or any agency thereof in any manner, or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined. . . .

buyers (transferees) of firearms in violation of 18 U.S.C. § 1001.[2] The defendants are federally licensed firearms dealers.

The case arises out of numerous firearms sales made by the defendants between 1990–1994 at their legitimate business, Traders Guns Shop, to alleged co-conspirators. In the view of the United States, the defendants conspired to defraud the Government, to impede the tracing function of the Treasury Department's Bureau of Alcohol, Tobacco and Firearms ("ATF"), and to aid and abet others in selling firearms without a federal firearms license. Basically, the United States contends that the defendants facilitated illegal "straw purchases" of firearms.

All charges against both defendants will be dismissed with prejudice because the United States (1) failed to make the *prima facie* conspiracy showing against Connie Dollar required by *United States v. James*, 590 F.2d 575, 582 (5th Cir.1979); (2) failed to adduce sufficient evidence that the defendants had a duty to disclose the matters allegedly concealed; and (3) flagrantly, breached its unquestioned obligation to produce exculpatory and impeachment materials imposed by *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

## I. STATEMENT OF THE CASE

The indictment was filed on May 2, 1997.

Count One charges both defendants under 18 U.S.C. § 371 with conspiracy to (a) defraud the United States, (b) falsify material facts in a matter within the jurisdiction of the ATF, and (c) aid and abet other persons to deal in firearms without a federal license. Counts Two, Five, Six, and Seven charge Connie Dollar with violating 18 U.S.C. § 1001 by concealing the identity of the actual buyers of firearms sold respectively to Vicki M. Stevens, Louis Ogle, Mary Emily

Pyle, and ATF agent Penny Strickland. Counts Four, Eight, and Nine of the Indictment charge William Dollar with violating § 1001 in like manner with respect to sales to Tommy Gossett and Michael Lackey.

The case was initially set for trial commencing on July 7, 1997. On timely joint motions of the defendants, the trial was ultimately continued to May 4, 1998.

On May 4, 1998, the parties appeared for trial. For reasons explained hereafter, trial was continued to September 8, 1998.

The case was tried from September 8 to September 11, 1998.

## II. THE DEFINITION OF "STRAW PURCHASES"

At the heart of the Government's case is the theory that the defendants and others conspired to conceal "straw purchases" of firearms for the purpose of allaying the anticipated suspicion of the ATF that the co-conspirators were engaged in the illegal resale of the firearms. Central to the case is the legal definition of "straw purchases."

■ The term "straw purchase" is not defined in either the United States Code or the Code of Federal Regulations. It is in fact a judicially created doctrine, a construction of one of the provisions of the Gun Control Act of 1968, 18 U.S.C. § 922(a)(6).[3] *See United States v. Moore*, 84 F.3d 1567, 1573 (9th Cir.1996).

> One purpose of the Act is to "keep firearms away from the persons Congress classified as potentially irresponsible and dangerous." *Barrett v. United States*, 423 U.S. 212, 218, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976). Prohibiting sham or "strawman" purchases serves this purpose. This

---

[O]r imprisoned not more than five years, or both.

**2.** At trial, the United States indicated that the substantive counts are grounded in 18 U.S.C. § 1001(a)(1), which provides

[W]hoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—

falsifies, conceals, or covers up by any trick, scheme or device a Material fact . . .

shall be fined under this title or imprisoned not more than five years, or both.

**3.** It shall be unlawful—for any person in connection with the acquisition of any firearm from a . . . licensed dealer . . . knowingly to make any false or fictitious oral or written statement . . . intended or likely to deceive such . . . dealer . . . with respect to any fact material to the lawfulness of the sale . . . .

occurs when a lawful purchaser buys for an unlawful one. [A] dealer who sells a gun knowing, or with reason to know, it is for an unlawful possessor, violates the Act. *Perri v. Department of the Treasury*, 637 F.2d 1332 (9th Cir.1981).

Thus, the proper focus of the straw man inquiry is the recipient's eligibility *vel non* to purchase a firearm.

The relevant cases have established the parameters of the doctrine. One of the early cases addressing the straw man doctrine is *United States v. Brooks*, 611 F.2d 614 (5th Cir.1980),[4] involving Title 18, § 922(b)(3).[5] In that case, the court focused on the ineligibility of the principal (Brooks), the ultimate recipient, to purchase the firearm which had actually been bought by his agent. Since Brooks was a non-resident of the state in which the firearm was purchased, our predecessor circuit held that the sale to the agent was a "sham transaction." *Id.* at 617. Relying on the "sham transaction" language of *Brooks*, the Sixth Circuit upheld the conviction under § 922(a)(6) of the agents who purchased firearms for a Canadian principal statutorily ineligible to purchase the firearms. *See United States v. Lawrence*, 680 F.2d 1126 (6th Cir.1982). The ineligibility of a Mexican national to purchase the firearms actually bought by another was the basis of the Fifth Circuit's affirmance of the former's conviction. *See United States v. Ortiz–Loya*, 777 F.2d 973 (5th Cir.1985). In *U.S. v. Hern*, 926 F.2d 764 (8th Cir.1991), the Eighth Circuit, citing *Brooks*, observed: "[a]lthough the use of a 'middleman' may be common practice at gun shows, § 922(b) 'is violated by a sham sale made to a resident when the transaction is really with a nonresident.'" 611 F.2d at 768. In affirming the § 922(a)(6) conviction in *U.S. v. Howell*, the Seventh Circuit noted:

> The essence of this case is that Mr. Howell *could not have purchased firearms lawfully because he was a felon. The jury was entitled to conclude, beyond a reasonable doubt, that Mrs. Howell was no more than a straw purchaser,* "an eligible purchaser

*who is acting as an agent, intermediary, or 'straws purchaser' for someone" who is ineligible to purchase the firearm directly.* 37 F.3d 1197, 1202 (7th Cir.1994). (emphasis added).

The Fifth Circuit squarely addressed the subject in a case last year:

> Although § 922(a)(6) on its face does not prohibit "straw purchases," we have nonetheless held that such transactions violate § 922(a)(6). *See, e.g., United States v. Ortiz–Loya*, 777 F.2d 973, 979 (5th Cir.1985). It is clear to us—indeed, the plain language of the statute compels the conclusion—that § 922(a)(6) criminalizes false statements that are intended to deceive federal firearms dealers with respect to facts material to the *"lawfulness of the sale"* of firearms. (Emphasis added). **Thus, if the true purchaser can lawfully purchase a firearm directly, § 922(a)(6) liability (under a "straw purchase" theory) does not attach.**

*United States v. Polk*, 118 F.3d 286, 295 (5th Cir.1997). (emphasis added).

The ATF, in its periodically published "Industry Circulars," the *Federal Firearms Regulations Reference Guide,* purports to interpret and explain the straw man doctrine for the benefit of federally licensed firearms dealers. Consistent with the court decisions, during the period covered by the indictment, the ATF interpreted the doctrine as referring to the purchase of a gun by an intermediary/agent for a person who is ineligible to purchase the firearm himself/herself.

In 1980, the ATF first defined "straw purchases" in "Industry Circular" 79–10, reprinted in the 1980 version of *Federal Regulation of Firearms Ammunition.* That publication stated:

### "Clarification of 'Straw Man Transaction' (79–10)"

"The term 'Straw Man Transactions' may be familiar to you. If not, we believe it would be helpful to you to explain what

---

**4.** This decision is binding on the Court. *See Bonner v. Prichard*, 661 F.2d 1206 (1981).

**5.** This provision of the Gun Control Act makes it unlawful for a dealer to "sell or deliver... any

firearm to any person who the licensee knows or has reasonable cause to believe does not reside in the State...." *Id.*

'Straw Man Transactions' are and offer some guidance concerning this type of transaction.

"Straw Man Transactions" are of two basic types, each of which involves a 'third party' sale. In the first type, the dealer may have reason to believe that the person who executes the Form 4473 is being used as a conduit to make an illegal sale to a person prohibited by the Gun Control Act from purchasing a firearm. For instance, a dealer may be approached by a potential purchaser who, when asked to identify himself, produces out-of-State identification or identifies himself as a felon. When the dealer informs the individual that he cannot sell to him because he is an out-of-State resident or a felon, the individual produces a friend who is eligible to purchase. The friend ('Straw Man') is then used as the purchaser of record when it is obvious that the actual recipient is a prohibited person.

"The second type of 'Straw Man Transaction' is similar to the first. However, in this instance, it is the dealer himself who suggests to the potential purchaser that a third party be used to effect the sale and such a sale is completed.

"**The Gun Control Act of 1968 does not necessarily prohibit a dealer from making a sale to a person who is actually purchasing the firearm for another person. It makes no difference that the dealer knows that the purchaser will later transfer the firearm to another person, so long as the ultimate recipient is not prohibited from receiving or possessing a firearm.** A dealer may lawfully sell a firearm to a parent or guardian who is purchasing it for a minor child. The minor's subsequent receipt or possession of the firearm would not violate Federal law, even though the law does prohibit a dealer's direct sale to the underage person. **What the Act forbids is the sale or delivery of a firearm to a person the licensee knows or has reason to believe is a person to whom a firearm may not be sold (e.g., a nonresident or a felon) or to a person the licensee knows will transfer the firearm to a person prohibited from receiving or possessing it.**

"A firearms licensee runs the risk of violating the law when he becomes involved in a transaction where it is apparent that the purchaser of record is merely being used to disguise the actual sale to **another person, who could not personally make the purchase or is prohibited from receiving or possessing a firearm.**

"Where the dealer knowingly utilizes this technique to sell a firearm to a prohibited person, both he and the 'third person' or 'Straw Man' are placed in a position of unlawfully aiding the prohibited person's own violation.

"We realize that this circular is quite general in tone. *The best advice we can give is that the dealer should be sure to have Form 4473 completed by the person to whom the dealer is actually selling the firearms; and if the dealer has any reason to believe the firearm is being acquired for a **prohibited person**, he should avoid the transaction.*

*Federal Regulations of Firearms and Ammunition, ATF P 5300.12 (11/80)* (Italics in original, bold added).

The substance of this definition of straw purchase, with the exception of the first paragraph, was not changed in ATF's next publication in 1984: *(Your Guide To) Federal Firearms Regulation 1984–85*; nor was the definition significantly modified in ATF's subsequent publication in 1988: *(Your Guide To) Federal Firearms Regulations 1988–89.*

Furthermore, during the years in question, the backside of Form 4473 consistently contained the following warning:

The sale or delivery of a firearm by a licensee to an eligible purchaser who is acting as an agent, intermediary or 'straw purchaser' for someone whom the licensee knows or has reasonable cause to believe is ineligible to purchase a firearm directly, may result in a violation of the Federal Firearms laws.

This form had to be completed by both the purchaser and the dealer on the sale of a firearm.

█ Thus, it is clear that the United States' basic underlying theory is fundamentally flawed. Any reasonable jury would be

compelled to conclude that none of the firearm purchases disclosed by the evidence fall into the definition of a straw purchase.[6] This is so because all the alleged "straw purchasers," as well as the alleged actual purchasers, were eligible to purchase firearms.

## III. THE DUTY TO DISCLOSE

As noted earlier, the substantive counts of the indictment charge the defendants with making false statements to a government agency in violation of 18 U.S.C. § 1001(a)(1). While these charges are encompassed by the United States' overarching theory of straw purchases, they are not dependent on that theory. Section 1001 is implicated whenever a person makes a false statement to a federal agency. For section 1001 purposes, it is immaterial that the firearms sales by the defendants were lawful sales under existing regulations, i.e., that the sales did not involve straw purchases.

■ In order to convict the defendants of violating § 1001(a)(1), the United States was required to prove each of the following elements beyond a reasonable doubt: (1) the defendants knowingly concealed a fact by a trick, scheme, or device, (2) the defendants acted willfully and knowingly; (3) the concealed fact was material; (4) the subject matter was within the jurisdiction of a federal department or agency; and (5) the defendants had a legal duty to disclose the concealed fact. *See U.S. v. Poarch*, 878 F.2d 1355, 1359 (11th Cir.1989). Hon. Edward J.

Devitt, et al., *Federal Jury Practice and Instructions* § 37.03 (Supp.1997).

■ The duty to disclose arises when disclosure is required by government statute, regulation, or form. *See United States v. Calhoon*, 97 F.3d 518, 526 (11th Cir.1996); *United States v. Cure*, 804 F.2d 625, 628–30 (11th Cir.1986); *United States v. Hernando Ospina*, 798 F.2d 1570, 1578 (11th Cir.1986).

■ Based on the evidence presented by the United States, a reasonable jury could have found that the United States proved the first four elements beyond a reasonable doubt. Abundant testimony, if found to be credible, showed that the defendants knew or suspected that the signatories on the 4473 forms were not the true purchasers of the firearms. Indeed, there was evidence that in some instances, the defendants suggested that the firearms be purchased in the names of persons other than the actual buyers. A reasonable jury could have found evidence beyond a reasonable doubt that the defendants acted willfully and knowingly. Without question, the subject matter (i.e., the identity of the purchaser) was material. *United States v. Klais*, 68 F.3d 1282 (11th Cir.1995); *United States v. Buck*, 548 F.2d 871 (9th Cir.1977). Likewise, the evidence established beyond a reasonable doubt that the identity of firearms purchasers is a matter within the jurisdiction of ATF, a federal agency.

---

**6.** Significantly, in 1995, the ATF changed its Form 4473 by redefining the term "straw purchase" to include eligible purchasers. The new definition, published in Federal Firearms Regulations Reference Guide (formerly "Your Guide To Federal Firearms Regulations"), provides:

Questions have arisen concerning the lawfulness of firearms purchases from licensees by persons who use "straw purchasers" (another person) to acquire the firearms. Specifically, the actual buyer uses the straw purchaser to execute the Form 4473 purporting to show that the straw is the actual purchaser of the firearm. In some instances, a straw purchaser is used because the actual purchaser is prohibited from acquiring the firearm.... In other instances, neither the straw purchaser nor the actual purchaser is prohibited from acquiring the firearm.

In both instances, the straw purchaser violates Federal law by making false statements on

Form 4473 to the licensee with respect to the identity of the actual purchaser of the firearm, as well as the actual purchaser's residence and date of birth.... The licensee selling the firearm under these circumstances also violates Federal law if the licensee is aware of the false statements on the form. *It is immaterial that the actual purchaser and the straw purchaser ... could have lawfully purchased firearms from the licensee.*

(emphasis added).

Language was added to require a declaration from the person who completes the form that he/she is the actual buyer, and to include a warning consistent with the new definition of straw purchase. *See Polk,* 118 F.3d at 295 n. 8.

Obviously, this 1995 change in the regulations cannot apply, *ex post facto*, to the 1990–1994 activities of the Dollars.

The rub is that the Dollars had no legal duty to disclose their knowledge/suspicion that the actual purchasers of the firearms were not the signatories on the 4473 forms.

The United States has cited 18 U.S.C. § 922(b)(5) [7] as the statutory source of the duty. The statute imposes no such duty. The United States' reliance is equally misplaced on 27 C.F.R. § 178.124(a), (c) as the regulatory source of the duty to disclose. Section 178.124(a) requires simply that a licensee "shall not sell or otherwise dispose . . . of any firearm to any person, other than another licensee, unless the licensee records the transaction on a firearms transaction record, Form 4473." Section 178.124(c) requires that prior to making a sale, a licensee

> shall obtain a Form 4473 from the transferee showing the name, address . . . , whether the transferee is a citizen of the United States, state of residence, date, and place of birth, height, weight, and race of the transferee, and certification by the transferee that the transferee is not prohibited by the [Gun Control] Act . . . from receiving a firearm.

The evidence is undisputed that the defendants recorded the firearms transactions at issue on 4473 forms *and* obtained executed 4473 forms from the transferees. Significantly, the regulation does not require a disclosure by the firearms dealer that the person sworn to be the transferee on the Form 4473 is not the actual purchaser of the firearm.

Unavailing is the United States' argument that Form 4473 itself imposes on the firearms dealer the duty to disclose. Section A of that form must be completed *by the buyer/transferee*. Certainly no dealer's duty to disclose can arise from that section. Section B, to be completed by the dealer, does not elicit information concerning the veracity of Section A. The latter section requires the dealer to verify the identity of the person who completes the former section; and on the basis of (1) the statements in Section A, (2) the verification of identity, and (3) the information in the current list of Published

Ordinances, the dealer asserts his/her belief that it is not unlawful to sell the described firearms "to the person identified in Section A." ATF Form 4473. Form 4473 on its face neither advises the dealer to report a suspicion/knowledge that the person listed in Section A is not the actual buyer of the firearms, nor contemplates that she will do so.

The duty to disclose under § 1001 does not arise out of thin air. It is created by either a statute, an agency regulation, or an agency form. *See Calhoon,* 97 F.3d at 526. A reasonable jury could not find beyond a reasonable doubt that such duty existed under the facts of this case.

Accordingly, the defendants' motions to dismiss counts 2, 3, 4, 5, 6, 7, 8, and 9 of the indictment [8] as a matter of law are due to be granted.

## IV. THE BRADY VIOLATIONS

### A. Defendant's Discovery Efforts and Court Orders

Within two weeks after the indictment, the defendants filed a motion for discovery and production, in which the first item requested was:

> [A]ll written or recorded statements, and oral statements or confessions or admissions subsequently reduced to writing, or summarized in F.B.I., A.T.F., police or other federal or state governmental reports, made or adopted by any defendant or defendants, or co-conspirators, or copies thereof, within the possession, custody, or control of the Government . . . .

Document ("Doc") 12. The defendants also requested "[w]ritten or recorded or summarized statements of all persons who the Government plans to call as witnesses, to be delivered to defense counsel, ten (10) days prior to trial." *Id.* Finally, the defendants specifically requested among other things:

> All material known to the government, or which through due diligence could be learned from the A.T.F., or other Government agents or prospective witnesses in

---

7. It shall be unlawful for any . . . licensed dealer . . . to sell or deliver- . . . . any firearm . . . to any person unless the licensee notes in his records . . . the name, age, and place of residence of such person . . . .

8. The United States concedes that it produced no evidence to support Count 5.

this case, which is exculpatory in nature or favorable to the accused or which may lead to exculpatory material, including, but not limited to:

(a) evidence that the defendants lacked knowledge of any of the acts alleged in the Indictment;

(b) evidence reflecting adversely on the credibility of any government witness, including, but not limited to, convictions for any criminal offenses and evidence of any actions reflecting dishonesty or mental impairment.

*Id.*

The defendants' motion was treated by the court as a request for discovery; and the United States purported to produce the discovery requested.

The defendants filed a "Motion For Production of Brady and Giglio Material" on January 7, 1998. In that motion, the defendants voiced their suspicion that the United States was withholding materials required by *Brady* and *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972). In response to the court's order, the United States filed a "Disclosure of Brady and Giglio Material" in this court on January 28, 1998. In its response, the United States provided impeachment information (i.e., conviction records in the related cases) concerning twelve of its potential witnesses, including Keith Edward Weaver, Michael Wayne Savage, and John Michael Lackey. The United States did not disclose that any of the twelve witnesses had given statements to ATF agents inconsistent with their anticipated trial testimony. A few days after its January 28 disclosures, the United States filed an "Additional Bill of Particulars," in which it informed that with respect to Counts 8 and 9 of the indictment, "Michael Lackey was acting as agent, intermediary and 'straw purchaser' for John J. Lackey." Doc. 55.

In an April 8, 1998, Rule 404(b) Notice, the United States informed the defendants of its intention to offer evidence at trial that the defendants knew that when Michael Savage executed ATF Forms 4473, he was not the true buyer of the firearms, but was instead acting as the "straw purchaser" for Jimmy Patterson. Doc. 65.

On April 29, 1998, counsel for the defendants wrote to the AUSA and recounted that "[i]n the past several days, we have been inundated with material that should have been produced long ago." Doc. 76, Exhibit "A." Counsel then requested the immediate production of specific documents. *Id.* At 4:30 P.M. on May 1—the Friday preceding the scheduled trial on Monday—the United States produced between 150–200 documents containing, among other things, additional *Brady* materials. *Id.*

On the morning of May 4, shortly before court convened, the defendants filed a Motion To Continue and For Evidentiary Hearing.

The United States conceded at the hearing on the motion that among the papers produced by the United States two days earlier was an ATF Assignment and Narrative Report. This report fairly supports the inference that one of the defendants may not have been aware of the strawman purchases from his business during existence of the alleged conspiracy.[9] Transcript of May 4, 1998, hearing ("Tr.5/4/98") at 18, 19. On the representation of defense counsel that other *Brady* material existed and had not been disclosed, the Court made the following inquiry of the United States:

THE COURT: Let me see if I can establish this. Mr. Posey, has the government given to the defendants all of the materials, whether in the compli-

9. Interviews with purchasers did, however, reveal the possible existence of strawman purchases being made at Trader's, i.e., Lucille and Mike Lackey making purchases of firearms for John Lackey and Charles Ward making purchases of firearms for Alva Davis.

... Agent Schaefer stated these purchases by Ward would constitute strawman purchases and he planned to bring criminal charges against Davis and Ward. *He also stated he planned to advise licensee Bill Dollar about the*

*possible strawman purchases and advise him not to make further such sales.*
Agent Schaefer was then advised that this office had been working in conjunction with Special Agent[s] ... for the past seven months regarding these allegations ... *Agent Schaefer was further advised that it would be preferable, at this time, not to advise Mr. Dollar about the strawman purchases.*
Doc. 78, at 4 (emphasis added).

ance section or any other section of the agency, all of the materials which may have *Brady* or *Giglio* import?

MR. POSEY: Your Honor, prior to my reading the defense motion this morning, I would have said yes. In light of that and not having had a chance to go back and double check, I would—before I made any representation to the Court, I am not absolutely for certain. I interviewed—

THE COURT: Well, let me just ask you this. How long do you think it would take for you to insure that all such materials have been provided?

MR. POSEY: . . . I would certainly think we could do that by the close of business today or certainly in the next day or so.

THE COURT: So by Wednesday morning [May 6]. Is that sufficient time?

MR. POSEY: Yes sir.

THE COURT: All right.

Tr. 5/4/98 at 26–27.

Because the United States had failed to timely produce *Brady* materials, the court continued the trial from May 4 to September 8, 1998.

B. Trial Testimony of Alleged Co-conspirators Justice, Pyle, Ogle, Newberry, Gossett, and Stephens

At trial, the United States called several witnesses in support of the conspiracy charge.

Ira Justice testified that the defendants knew that he was the actual buyer of large quantities of firearms (over 800) which he resold to other persons. The defendants encouraged Justice to buy the guns in the names of others so that when the guns were resold, ATF would be unable to trace the guns back to him. According to Justice, the Dollars knew that he was reselling the guns at flea markets.

At all material times, Justice was eligible to purchase firearms, and he purchased over eighty firearms from the defendants in his own name. Justice is in the flea market business and he operates a variety store in Attala, Alabama. He is a cooperating witness for the Government.[10]

The ATF Case Agent took a pre-indictment statement from Justice. It was never produced to defense counsel.

Mary Pyle, who worked in Ira Justice's variety store, testified that as a favor to Justice, on two occasions she accompanied him to Trader's Gun Shop and signed 4473 forms. She did not select, touch, pay for, or transport any of the firearms bought in her name. She has plead guilty to making a false statement concerning a firearms transaction and she has been sentenced to fifteen months imprisonment. As a cooperating witness, whether she goes to prison depends on the United States' assessment of the value of her cooperation in this case. In her late fifties/early sixties, this is her first criminal offense.

The court inquired, "Why did you plead guilty, Ms. Pyle?" She responded, "Well, I signed my name on the papers [4473 forms]."

The Court: Did you know what you were doing when you signed them?

Ms. Pyle: No sir, I didn't, I mean I—the guy just told me that we had to come down and get some guns. . . . and for me to sign my name on them so he could get them. I didn't know it was against the law. I thought he had a license to do it.

TT. 446.

Louis Ogle, Brenda Newberry Ratliff, Tammy Gossett, and Vicki Stephens also testified that at Ira Justice's behest they signed 4473 forms at Trader's Gun Shop for firearms selected and paid for by Justice. Except for Newberry, they have all pled guilty to violating 18 U.S.C. § 924(a)(1)(A),[11] and

---

10. Justice plead guilty to dealing in firearms without a license and was sentenced to 30 months imprisonment over 1½ years ago. Whether he goes to prison depends solely on the United States' assessment of the value of his cooperation in this case. A seriously ill man, his life expectancy is only 2½ years.

11. The statute provides:

[W]hoever . . . knowingly makes any false statement or representation with respect to the information required . . to be kept in the records of a [licensed firearms dealer] . . . shall be fined under this title, imprisoned not more than five years, or both.

anticipate motions for downward departure based on their assistance to the United States in this case. The charge against Newberry presumably has now been dismissed, pursuant to her Pretrial Diversion Agreement with the United States.

### C. John Michael Lackey

On direct examination, alleged co-conspirator Lackey testified that beginning in late 1990, he drove his father to Traders Gun Shop to purchase firearms on several occasions. On entering the store, Lackey testified: "Well, I would just stand back, and he would pick out the guns that he needed, uh, and purchase the guns, and I would sign for the papers on them." TT. 487. He also testified that they dealt with both Connie and William Dollar; that he told them that he was not the true buyer of the firearms; and that the Dollars knew that he was not the true buyer of the firearms.

Initially indicted for dealing in firearms without a federal license, 18 U.S.C. § 922(a)(1)(A), Lackey pled guilty to an information charging him with making a false statement concerning information required to be kept by a federal firearms dealer, 18 U.S.C. § 924(a)(1)(A). Because of his cooperation with the United States, he expects to receive probation.

On cross-examination, Lackey expressly denied ever having sold guns at Trade Day, a flea market in Collinsville, Alabama. He denied having ever sold for profit any of the guns which his father purchased at Traders, except for his father's personal gifts of firearms to him. He confirmed that both he and his father were eligible to purchase firearms.

As of the time Lackey was excused as a witness, the United States had not produced any prior statement of Lackey which contradicted his trial testimony.

During the lunch recess, *after the United States rested its case against the defendants,* the AUSA delivered to defense counsel additional *Brady* materials, including sworn, handwritten answers of Lackey to questions contained in an ATF statement. Lackey wrote that he had purchased firearms from Traders Gun Shop in his answers.

In response to the question, *"Did you buy the firearms for you or for someone else,"* Lackey penned the words: *"For me to sell."*

TT. 716. He wrote, *"For me and no one else,"* as his response to the question, *"Who [sic] did you purchase firearms for?"* TT. 717.

### D. Michael Wayne Savage

Michael Wayne Savage, another alleged unindicted co-conspirator, testified on direct examination that he accompanied his friend Jimmy Patterson to Traders Gun Shop "a lot of times." On those occasions, according to Savage's testimony on direct examination, Patterson always selected the firearms and paid for them. Savage simply "signed some yellow sheets" for Patterson's gun purchases. He further testified on direct examination that Patterson and William Dollar talked about gun sales at Trade Days in Collinsville. The upshot of Savage's testimony on direct examination by the United States was that the defendants knew that he was the straw buyer for Patterson, and they knew that Patterson resold the guns at the Collinsville flea market.

When the AUSA passed Savage for cross examination, prior statements were not provided to defense counsel as contemplated by the Jencks Act, 18 U.S.C. § 3500(b). Indeed, the existence of these statements was unknown to defense counsel.

However, on cross-examination, Savage testified that he had been interviewed twice by ATF agents. He was unsure whether his statements had been recorded; but "I have got a paper about this thick [indicating] where we went over it on paper." TT. 520. He testified that papers were "out in the hall." TT. 521. The court recessed while he went back to the witness room to retrieve the papers. He returned shortly with his file. Included in the file was a statement which he gave to ATF Special Agent R.J. McCormick on November 17, 1994.

In this ATF form document, Savage swore that *he* purchased the guns from the defendants, and that he sold and traded them at flea markets and swap meets, reaping a profit at three to four dollars on each gun he resold. Defendants' Exhibit ("DX") 11.

Savage's file also contained the following notes of ATF Special Agent McCormick concerning the interview:

In summary Savage stated that he began purchasing firearms at Gun Traders in Center Point approximately three years ago, and that he purchased about three hundred firearms within the last year. Mr. Savage related that he sold and/or traded all of these firearms to various people at the Mountaintop Trade Days in Collinsville, Alabama, which has a swap store every Saturday....

Mr. Savage related that his motives for purchasing and then selling these firearms was to make some money because he was out of work .... Mr. Savage stated that he had previously asked Bill and Jeannie Dollar, "If I were to get in any kind of trouble with ATF, if I buy and sell all of these guns." On different occasions both Bill and Jeannie Dollar would reply by saying, "As long as you," Savage, "don't sell any of these guns to minors, felons or out-of-state people, you would be okay."

DX 11.

*The United States never produced these documents to the defendants!*

On further cross-examination, Savage denied making some of the statements attributed to him in McCormick's summary. According to the AUSA, McCormick was in the District of Columbia at the time of the trial. In any event, he was unavailable to the defendants to be called as a witness.

Savage has made a plea bargain with the United States similar to that of John Lackey and Keith Weaver.

Both Savage and Patterson are eligible to purchase firearms.

### E. Keith Weaver

Alleged co-conspirator Keith Weaver was called as the United States' final substantive witness. On direct examination, he testified that he and Jimmy Patterson traveled to flea markets and Trade Days every other weekend for six months or so in 1992 and 1993, where they bought, sold, and traded guns. He sometimes accompanied Jimmy Patterson to Traders Gun Shop where Patterson would select and pay for certain firearms, Jennie Dollar would "do the paperwork," and he would simply sign his name in the space marked "TRANSFEREE'S (Buyer's) SIGNATURE" on the ATF Form 4473. Both he and Patterson were eligible to purchase firearms; but neither of them had a federal firearms license. When he asked William Dollar about the legality of buying guns and selling them at flea markets, Dollar assured him that it was legal to do so.

On the evening preceding Weaver's testimony, the United States first provided the defendants with a copy of the summary of an ATF interview with Weaver on June 1, 1995. The summary was written by Special Agent McCormick. It indicates the following:

In summary, Mr. Weaver stated that he began purchasing firearms at Traders in Center Point approximately three years ago, and that he purchased about five hundred (500) firearms within the last three years.

.             .             .             .             .

Mr. Weaver related that he began purchasing fifteen to twenty firearms at a time at Traders, but later he would purchase as many as fifty at a time. Mr. Weaver stated that he could usually sell all of the firearms which he "would bring up to Collinsville" at any one time. Mr. Weaver stated that he preferred to purchase the handguns which "were new in the box, ... mostly .25's and .380's, which would sell the best."

.             .             .             .             .

Mr. Weaver stated that he would sometimes be accompanied by Jimmy Patterson when he (Weaver) was purchasing the handguns from Traders Guns .... Mr. Weaver stated that, though he was sometimes accompanied by Patterson when he was purchasing a quantity of firearms, he (Weaver) would always complete and sign the ATF Form 4473, Firearms Transaction Form, in his (Weaver) name.

.             .             .             .             .

At the conclusion of this interview, Mr. Weaver agreed to provide a Written Statement of some of the information which he provided during this interview. Mr. Weaver affixed his signature to this statement which I witnessed by also signing my signature.

PX 20. Having the overnight benefit of the summary of Weaver's statement given to the

ATF three years earlier, counsel for the defendants were able to point out to the jury the obvious inconsistencies between Weaver's trial testimony and the summary of his 1995 ATF statement. However, Weaver denied the accuracy of parts of the summary. Again, McCormick was in the District of Columbia and hence unavailable to be called as a witness by the defendants.

Defense counsel were never given a copy of a statement written and executed by Weaver and witnessed by McCormick on November 18, 1995.

Between his 1995 statement to the ATF and the trial of this cause, Weaver was indicted in this district for selling firearms without a license, 18 U.S.C. § 922(a)(1)(A). After he agreed to testify against the defendants in this case, the United States dismissed the indictment. Weaver plead guilty to a one-count information charging him with making a false statement in connection with a firearm transaction, 18 U.S.C. § 924(a)(1)(A). His sentence has been continued pending the outcome of this case, and the United States' assessment of the value of his cooperation. He expects to receive probation.

## V. THE JAMES HEARING AND THE CONSPIRACY CHARGE AGAINST CONNIE DOLLAR

At trial, before receiving as evidence against each defendant inculpatory statements of alleged unindicted co-conspirators, the court conducted a hearing outside the presence of the jury, pursuant to *United States v. James.*

The only witness called by the United States was Gerald Charles Greco, III.

The court found and concluded that if a reasonable jury chose to credit Greco's testimony (which the court found to be incredible), it could find beyond a reasonable doubt that a firearms conspiracy existed, that Greco and William Dollar were members of the conspiracy, and that the inculpatory statements were made in the course of and in furtherance of the conspiracy.

No evidence against Connie Dollar was adduced at the hearing.

At the conclusion of the hearing, the court granted Connie Dollar's motion to dismiss

the conspiracy charge against her. It denied a similar motion by William Dollar.

## VI. THE CONSPIRACY CHARGE AGAINST WILLIAM DOLLAR

■ The conspiracy count against William Dollar alleges that he violated 18 U.S.C. § 371 by conspiring to aid and abet, and conceal, the illegal sale of firearms. In order to sustain a conviction under § 371, the government must prove: (1) two or more persons came to a mutual agreement to accomplish an unlawful plan; (2) the defendant knowing the unlawful plan, willfully joined it; (3) one of the conspirators, during the existence of the conspiracy, committed an overt act, described in the indictment; and (4) the overt act was in furtherance of the conspiracy. *See Eleventh Circuit Pattern Jury Instructions (Criminal Cases)* 144 (1997).

Upon review of the evidence presented in the government's case, the court concludes that a reasonable jury could find that the government proved beyond a reasonable doubt the elements of § 371. It is a close question because there is a plausible scenario completely consistent with a theory of innocence. It may be argued with a straight face that Dollar's sole purpose was to maximize his profits through aggressive but legal firearm sales at his gun store. He never sold firearms to ineligible purchasers. His actions/advice to his customers never violated the firearms laws or any other laws. However, this version of the facts is not sufficiently compelling to direct a verdict for this defendant. But for the *Brady* violations, the court would have submitted the conspiracy charge against William Dollar to the jury.

■ Fairness is a founding principle of our criminal justice system. Consistent with that principle, it has been a longstanding rule, established some 35 years ago, that the prosecution must produce to a defendant any evidence that is favorable to the defense. Suppression of evidence material to either guilt or innocence of a defendant violates due process. *See Brady,* 373 U.S. at 87, 83 S.Ct. 1194. In the words of the Supreme Court, "Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice

suffers when any accused is treated unfairly." *Id.*

■ The court is forced to conclude that the United States has defaulted on its fairness obligation in this case. In its determined effort to convict the defendants, the United States has trampled on their constitutional right to *Brady* materials. In its understandably zealous effort to enforce the nation's firearms laws, the United States has disregarded its constitutional and statutory obligations [12] to the defendant and its ethical obligation to the court.

From the outset of this case, defense counsel have been unrelenting in their effort to obtain *Brady* materials. The United States' general response has been to disclose as little as possible, and as late as possible—even to the point of a post-trial *Brady* disclosure. That the *Brady* materials are highly probative cannot be gainsaid; the United States has not questioned the probity of these materials.

The United States has also breached the duty of professionalism and candor owed to the court. The court gave the United States the benefit of the doubt on May 4 when the case was set for trial. Rather than grant the defendants' well-founded motion to dismiss for *Brady* violations, the court granted the United States such additional time as it said it needed to produce all *Brady* materials which had not been produced. At considerable judicial inconvenience, the court continued the trial of the case for another four months. Even so, after having assured the court that it had produced all *Brady* materials, the United States continued to withhold materials which clearly and directly contradicted the direct testimony of several of its most important witnesses.

Moreover, several of the documents filed by the United States call into question whether it has proceeded in this case in good faith. For example, in its supplemental bill of particulars, the United States asserted that Michael Lackey acted as the agent for John Lackey. Yet, the United States *had in its possession at the time it filed the document* Michael Lackey's sworn, handwritten statement that he acted for himself! The United States called other witnesses whose direct testimony indubitably contradicted their sworn statements previously given to agents of the United States, in the exclusive possession of the United States, and unavailable to the defendants.[13]

The court will not yield to the strong temptation to issue a Show Cause Order to the United States for one reason, and one reason alone.

The court has been made aware that G. Douglas Jones, the United States Attorney for the Northern District of Alabama, has recently implemented a new discovery policy for that office. Adherence to that policy will likely obviate the kinds of problems the court has seen in this case.

In any event, due to the prejudice that the defendant William Dollar has suffered as a result of the United States' transgressions in this case, the conspiracy charge against him will be dismissed, with prejudice.

## CONCLUSION

The defendants' motions for judgment as a matter of law will be granted, and the case will be dismissed with prejudice.

---

**12.** 18 U.S.C. § 3500; *Jencks v. United States,* 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

**13.** As long ago as .... 1935, [t]he Supreme Court made clear that deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary demands of justice." *Giglio, supra,* 405 U.S. at 153, 92 S.Ct. at 766.