**132 Nev., Advance Opinion 9**

IN THE COURT OF APPEALS OF THE STATE OF NEVADA

JONATHAN QUISANO,
Appellant,
vs.
THE STATE OF NEVADA,
Respondent.

No. 66816

**FILED**

FEB 18 2016

TRACIE K. LINDEMAN
CLERK OF SUPREME COURT
BY_____
CHIEF DEPUTY CLERK

Appeal from a judgment of conviction, pursuant to an *Alford* plea,[1] of voluntary manslaughter and child abuse, neglect, or endangerment with substantial bodily harm. Eighth Judicial District Court, Clark County; Valerie Adair, Judge.

*Affirmed.*

Philip J. Kohn, Public Defender, and Howard Brooks and Nancy Lemcke, Deputy Public Defenders, Clark County,
for Appellant.

Adam Paul Laxalt, Attorney General, Carson City; Steven B. Wolfson, District Attorney, and Steven S. Owens, Chief Deputy District Attorney, Clark County,
for Respondent.

BEFORE GIBBONS, C.J., TAO and SILVER, JJ.

---

[1]*See North Carolina v. Alford*, 400 U.S. 25 (1970).

## OPINION

By the Court, SILVER, J.:

Appellant Jonathan Quisano pleaded guilty, pursuant to *Alford*, to voluntary manslaughter and child abuse, neglect, or endangerment with substantial bodily harm. During the pendency of this case, the Clark County District Attorney's office maintained a discovery policy that provided for disclosure of all discovery to the defense. After entry of Quisano's guilty plea, but before sentencing, the State obtained an affidavit relevant to Quisano's case but did not disclose the affidavit to Quisano. The State used the affidavit at Quisano's sentencing hearing to impeach Christina Rodrigues—the victim's mother and Quisano's longtime girlfriend—after she provided a favorable oral statement to the court on Quisano's behalf, under the guise of a victim-impact statement. During the sentencing hearing, the district court permitted the *Las Vegas Review-Journal* to provide electronic coverage of the proceeding, although the media outlet did not timely file a request for permission and the district court did not enter a corresponding order or make the requisite particularized findings on the record. In accordance with the guilty plea agreement, the district court sentenced Quisano to serve a prison term of 4-10 years for voluntary manslaughter and a consecutive prison term of 6-19 years for child abuse, neglect, or endangerment with substantial bodily harm.

First, we consider whether the State failed to disclose the affidavit in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). We conclude Quisano's *Brady* argument fails because the affidavit was not favorable to him.

Second, we evaluate whether the failure to disclose the affidavit, notwithstanding the State's discovery policy, warrants reversal. As a threshold matter, we conclude the State's discovery policy constituted an open-file policy. In *McKee v. State*, 112 Nev. 642, 647-48, 917 P.2d 940, 943-44 (1996), the Nevada Supreme Court held that where a prosecutor maintains an open-file policy, the prosecutor is under a duty to disclose all evidence in the State's possession, regardless of whether the evidence is inculpatory or exculpatory. We conclude that the duty set forth in *McKee* extends through entry of the judgment of conviction and that the prosecutor engaged in misconduct by failing to disclose the affidavit in accordance with the State's open-file policy. Nevertheless, the misconduct did not substantially affect the district court's sentencing determination or prejudice Quisano and, therefore, does not warrant a new sentencing hearing.

Third, we assess whether the district court erred by permitting the *Las Vegas Review-Journal* to record Quisano's sentencing hearing. Although we hold that the district court did not err by granting the media outlet's untimely request, we conclude the district court did err in not making particularized findings on the record regarding all of the factors set forth in SCR 230(2) or issuing a written order granting the media outlet's request. But those errors did not contribute to the district court's sentencing determination. Accordingly, we conclude Quisano is not entitled to relief on this basis.

Based on the foregoing, we affirm the judgment of conviction.

## FACTS AND PROCEDURAL HISTORY

On June 6, 2013, Khayden Quisano, the three-year-old child of appellant Jonathan Quisano and Christina Rodrigues (Quisano's longtime girlfriend), died as a result of injuries associated with blunt-force trauma

to the head. At the time Khayden sustained his injuries, he was under the sole supervision of Quisano, who was charged with murder shortly after Khayden succumbed to his injuries. Quisano maintains that Khayden was injured after falling off a couch and hitting his head on a tile floor. However, Quisano provided conflicting accounts regarding the circumstances surrounding Khayden's injuries, and the medical experts who testified at Quisano's preliminary hearing disagreed with each other as to whether Khayden's injuries were consistent with a fall from a couch.

Prior to the commencement of trial, Quisano and the State entered into a guilty plea agreement under which Quisano agreed to plead guilty, pursuant to *Alford*, to one count of voluntary manslaughter and one count of child abuse, neglect, or endangerment with substantial bodily harm. Under the guilty plea agreement, the State retained the right to argue but agreed it would not argue for a minimum sentence exceeding ten years. Quisano pleaded guilty in accordance with the agreement on June 25, 2014.

At Quisano's sentencing, a reporter from the *Las Vegas Review-Journal* was present in the courtroom with a camera. Because the media outlet did not file a timely request for permission to provide electronic coverage of the proceeding, Quisano's counsel moved to exclude it from recording the hearing or photographing the participants. In evaluating Quisano's motion, the district court reasoned that permitting the outlet to provide electronic coverage of the proceeding would serve the public interest by facilitating public oversight of the judicial process. The district court noted it generally grants all requests to provide electronic coverage and would have granted a request from the outlet had it filed one. Observing that other media outlets filed requests to provide

electronic coverage of Quisano's case, the district court asked Quisano how he would be prejudiced if the *Las Vegas Review-Journal*, as opposed to the other media outlets, electronically covered the sentencing hearing. Counsel for Quisano responded, "[t]here isn't actual prejudice other than the fact that they shouldn't benefit from not following the rules any more than we should." Based on the foregoing, the district court orally denied Quisano's request to exclude the reporter from recording the proceeding.

After the district court ruled on Quisano's objection, the State argued, consistent with the guilty plea agreement, that the district court should sentence Quisano to consecutive sentences with a minimum term totaling ten years but did not make a specific argument with regard to the maximum term. In support of its argument, the State asserted that Quisano provided inconsistent accounts of how Khayden sustained his injuries and that the injuries were inconsistent with a fall from a couch. The State also informed the district court that Quisano had a documented history of child abuse and neglect[2] and argued that Quisano was likely to reoffend.

Quisano argued for probation or a short prison term. In support of that argument, Quisano asserted that Khayden's injuries were consistent with a fall from a couch, and that even if he caused Khayden's

---

[2]While Quisano was living in Hawaii, one of his children, Jayden Quisano, died of Sudden Infant Death Syndrome (SIDS). Subsequently, Khayden was hospitalized with symptoms similar to SIDS. Tests at the hospital revealed that Khayden suffered from a broken leg and broken ribs—injuries deemed to be the result of nonaccidental trauma. Because of those injuries, Child Welfare Services in Hawaii removed Khayden from the family household. Nevertheless, Child Welfare Services ultimately returned Khayden to Quisano and Rodrigues' care after completion of a case plan.

injuries, his acts were attributable to "a single momentary lapse or loss of patience." After concluding his argument, Quisano requested that the district court permit the victim's mother, Rodrigues, to address the court. Rodrigues provided a victim-impact statement that consisted of a few sentences.[3] Specifically, Rodrigues testified that "[Quisano] was a kind, loving, caring, responsible father who showed love and affection to his children every day" and that "[s]ending him to prison will harm more than it will help."

In comparison, the State responded by extensively cross-examining Rodrigues using information from an affidavit signed by an employee of the Clark County Department of Family Services (DFS), and dated September 4, 2014.[4] In the affidavit, the DFS employee averred as follows:

> [O]n June 9, 2014, I requested case closure of the dependency case as to the parents because the natural mother, Christina Rodrigues, articulated protective capacity. Christina Rodriguez [sic] had come to recognize that [Khayden] died as a result of physical abuse by the natural father, Jonathan Quisano. Christina Rodrigues further expressed that Jonathan

---

[3]Typically, in a victim-impact statement, the victim addresses "the crime, the person responsible, the impact of the crime on the victim and the need for restitution." NRS 176.015(3)(b). Although Rodrigues was a victim of the crime because her child was killed, her victim-impact statement actually addressed mitigating Quisano's sentence. Her entire victim-impact statement consisted of less than one page of the sentencing transcript.

[4]Quisano pleaded guilty on June 25, 2014, and was sentenced on October 7, 2014. Thus, the State obtained the affidavit after Quisano pleaded guilty but before sentencing.

Quisano should be punished for his abuse of [Khayden] and that she believed Jonathan Quisano should go to prison.[5]

The State began by inquiring, over objections from Quisano, whether Rodrigues believed Quisano should go to prison, and then later, whether she believed that Quisano "committed abuse against [her] son that died, Khayden." In response to Quisano's objection, the State indicated that it was seeking victim-impact testimony, and the court agreed, allowing the questioning. Rodrigues answered that she did not believe Quisano abused Khayden and that she hoped that he would receive probation.

There were several more objections from Quisano prompting the court to attempt to limit the inquiries by the prosecutor, but the court relented when the State asked for "just a little leeway." The State then asked whether Rodrigues remembered speaking with a judge in family court and whether she stated that Quisano "committed abuse against [her] son Khayden" and that "[Quisano] should be punished for his crime" with imprisonment. Rodrigues responded, "[t]hat didn't come out of my mouth." Finally, the State alleged, "you went to court one time and asked for one thing, and you're coming to court now and asking for the complete opposite." Quisano objected to the statement, and the district court

_____

[5]Quisano and Rodrigues had three children: Jayden, Khayden, and K.Q. As previously noted, Jayden died in Hawaii of SIDS. After the events that gave rise to Quisano's conviction—specifically, Khayden's death—K.Q. was placed in protective custody by DFS. Rodrigues subsequently sought to regain custody of K.Q. The DFS employee assigned to K.Q.'s dependency case prepared the subject affidavit following an adjudicatory hearing on that matter.

sustained the objection, noting that the affidavit discussed testimony before another forum.

After the State concluded its questioning of Rodrigues, Quisano informed the district court that the State did not disclose the affidavit during discovery. The State responded that "[i]t's not part of discovery. This is a victim-impact statement." And Quisano replied: "Judge, it's a document that's in the possession of the prosecution, and all the way up to including sentencing is to be provided to the defense in discovery. That's anything in aggravation or mitigation."[6] The district court did not specifically address Quisano's final objection. But, given his objections, Quisano requested that the district court designate the affidavit as a court exhibit for the record, which the district court did.[7]

Before imposing sentence, the district court expressed concerns regarding the conflicting medical evidence in the case, but it stated that Quisano's prior substantiated record of child abuse in Hawaii was "the tipping point for the Court." The district court sentenced

---

[6]Thus, as addressed below in our discussion of the State's discovery policy, Quisano raised a general objection, identifying a potential discovery violation and questioning the temporal scope of the State's duty to disclose discovery, but he did not use the precise words "it's a violation of the State's discovery policy."

[7]The colloquy then continued, but the State did not argue in response that its discovery policy did not require disclosure. Rather, the prosecutor informed the district court that Quisano did not provide notice that Rodrigues would give a victim-impact statement prior to the sentencing hearing. The burden, however, is on the State to notify the victim about the sentencing date, and the court must allow the victim to testify. NRS 176.015(3)-(4). Moreover, notice of the victim's intent to testify is not an element within the statute. *Id.*

Quisano to serve a prison term of 4-10 years for voluntary manslaughter and a consecutive prison term of 6-19 years for child abuse, neglect, or endangerment with substantial bodily harm. Quisano now appeals.

## ANALYSIS

Quisano contends that this court should vacate his sentence and remand for a new sentencing hearing because (1) the State withheld the affidavit in violation of *Brady*; (2) the State professed to have an open-file policy, and, therefore, was subject to a duty to disclose the affidavit;[8]

---

[8]The parties' initial briefs addressed the applicability of *Brady*; however, neither party raised the issue of whether the State's discovery policy constituted an open-file policy that created an ongoing duty to disclose all evidence in the State's possession to Quisano. After thoroughly reviewing the parties' briefs and the appendix, we concluded that supplemental briefing was warranted. Accordingly, we exercised our discretion to request supplemental briefing and issued an order directing the parties to address whether the State has a continuing duty to provide the defendant with discovery through sentencing under *McKee v. State*, 112 Nev. 642, 648, 917 P.2d 940, 944 (1996). *See Sharma v. State*, 118 Nev. 648, 651, 655-58, 56 P.3d 868, 870, 872-74 (2002) (explaining that the supreme court ordered supplemental briefing after raising issues at oral argument, and reaching issues addressed in the supplemental briefs). In response, we received briefs from both Quisano and the State addressing the question presented.

In addition to our discretion to request supplemental briefing, this court also has discretion to consider issues raised for the first time on appeal that involve recurring questions of law. *See, e.g., Salazar ex rel. Salazar v. Dist. of Columbia*, 602 F.3d 431, 437 (D.C. Cir. 2010) ("[C]ourts of appeals have discretion to address issues raised for the first time on appeal, but exercise such discretion only in exceptional circumstances, as, for example, in cases involving uncertainty in the law; novel, important, and recurring questions of federal law; intervening change in the law; and extraordinary situations with the potential for miscarriages of justice." (internal quotation marks omitted)). Issues similar to that addressed today have arisen in several cases before this court and, therefore, are
*continued on next page...*

COURT OF APPEALS
OF
NEVADA

(O) 1947B

and (3) the district court erred by allowing the *Las Vegas Review-Journal* to provide electronic coverage of Quisano's sentencing hearing where the outlet did not file a timely request for permission and the district court did not issue an order or make particularized findings on the record.[9]

*Brady v. Maryland*

Quisano contends that a new sentencing hearing is warranted because the State withheld impeachment evidence in violation of *Brady* and its progeny by failing to disclose the affidavit. Despite the State having listed Rodrigues as a witness in its case-in-chief, the State counters

---

*...continued*

likely to recur. Moreover, discovery and related sentencing issues occur repeatedly, so it is appropriate for the court to clarify this area of the law. Accordingly, the present case is "fully at issue and ready for decision." *Sharma*, 118 Nev. at 651, 56 P.3d at 870.

[9]Quisano also contends that the district court erred by allowing the State to cross-examine Rodrigues about matters exceeding the permissible scope of NRS 176.015(3)—specifically, prior bad acts and family court proceedings. We disagree. During its cross-examination of Rodrigues, the State inquired about the acts underlying this case and an appropriate sentence for Quisano. Both topics are permissible in a victim-impact statement. *See* NRS 176.015(3) (providing that a victim may "[r]easonably express any views concerning the crime"); *see also Randell v. State*, 109 Nev. 5, 8, 846 P.2d 278, 280 (1993) (concluding a victim may express an opinion regarding an appropriate sentence for the defendant in a noncapital case). Neither the State nor Rodrigues referenced prior bad acts during Rodrigues' victim-impact statement. And, to the extent that the State inquired about family court proceedings, it only did so to lay a foundation to impeach Rodrigues using the affidavit.

Quisano further asserts that the affidavit, the victim-impact statement, and the State's violation of SCR 230 all constitute "impalpable or highly suspect evidence." *Silks v. State*, 92 Nev. 91, 94, 545 P.2d 1159, 1161 (1976). We have reviewed these arguments, and we conclude they are without merit.

that the affidavit does not fall within the scope of *Brady* and its progeny because it was neither favorable to Quisano nor useful to impeach a government witness, including Rodrigues, at trial.

"Determining whether the state adequately disclosed information under *Brady* . . . requires consideration of both factual circumstances and legal issues; thus, this court reviews *de novo* the district court's decision." *Mazzan v. Warden*, 116 Nev. 48, 66, 993 P.2d 25, 36 (2000). The State violates a defendant's right to due process where it suppresses or fails to disclose evidence that is favorable to the accused and material to the issue of guilt *or punishment*. *Brady v. Maryland*, 373 U.S. 83, 87 (1963); *Mazzan*, 116 Nev. at 66, 993 P.2d at 36. To establish a *Brady* violation, a defendant must prove the following three elements: (1) the State withheld or failed to disclose evidence, (2) that evidence was favorable to the defense, and (3) prejudice ensued. *Mazzan*, 116 Nev. at 67, 993 P.2d at 37. Favorable evidence is not limited to exculpatory evidence, but rather includes evidence that "provides grounds for the defense to attack the reliability, thoroughness, and good faith of the police investigation, to impeach the credibility of the state's witnesses, or to bolster the defense case against prosecutorial attacks." *Id.*

Quisano's argument that the State violated *Brady* by failing to disclose the affidavit lacks merit because the affidavit was not favorable to Quisano. In the affidavit, a DFS employee alleges that Rodrigues acknowledged Quisano's responsibility for the death of their son and stated that Quisano should be imprisoned for his conduct. Even if the State had disclosed the affidavit, it would not have provided Quisano with a basis to attack the police investigation, impeach the State's witnesses, or bolster his case against prosecutorial attacks. *See id.* Moreover, the

affidavit was not exculpatory, as Quisano could not use it to explain away the charges. *See King v. State*, 116 Nev. 349, 359, 998 P.2d 1172, 1178 (2000) (defining exculpatory evidence "as evidence that will explain away the charge"). Because the affidavit was not favorable to Quisano, his argument fails, and we need not consider the remaining *Mazzan* factor.[10]

*Open-file policy*

Quisano argues that because the State professed to have an open-file policy, it was subject to a duty to disclose all evidence—whether inculpatory or exculpatory—in its possession. Quisano maintains that the State's failure to comply with that duty unfairly surprised and prejudiced him, and he contends that he is entitled to a new sentencing hearing.

As a threshold matter, we consider whether, under the facts of the present case, the State maintained an open-file policy. The record includes several file-stamped "Receipt of Copy" forms, indicating that the State furnished Quisano with various discovery materials. Each Receipt of Copy includes a summary of the State's discovery policy in bold typeface. That policy provides as follows:

> The State formally invites the defense to review the State's case file in the instant matter. This invitation *is ongoing* and is intended to make all discovery in the State's possession available and accessible to the defense. In addition, the State, at the request of the defense, will facilitate a review of the case file information housed at the Las Vegas Metropolitan Police Department (LVMPD) . . . . In addition, the State, at the

---

[10]The State also argues that it was not required to disclose the affidavit under *United States v. Ruiz*, 536 U.S. 622 (2002). Given our conclusion regarding Quisano's *Brady* argument, we need not reach that issue.

request of defense counsel, will also facilitate access to all evidence at the evidence vault which has been impounded . . . .

It is the desire of the State to provide the defense with full access to all discovery in the possession of the State. That access is available now.

The State acknowledges that its discovery obligations are continuing and the State will make all subsequent discovery received, if any, available to the defense in compliance with the requirements of NRS 174.235, as well as *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150 (1972).

*The State also takes this opportunity to formally request reciprocal discovery from the defense and for the defense to provide timely access to any discovery that it intends to use at trial.*

The record reveals that the State never argued or even suggested to the district court that the affidavit was not required to be disclosed under its discovery policy.

On appeal, the State selectively quotes the third paragraph of the policy and argues that it only committed to disclose evidence under NRS 174.235, *Brady*, and *Giglio*. We note that if the policy allowed the State to unilaterally assess whether materials are discoverable before disclosing those materials to Quisano, the policy would serve no purpose other than to signal the State's intent to comply with the law. However, limiting the policy in that manner completely ignores the first and second paragraphs of the policy, which set forth the State's intent to provide access to "all discovery" in its possession to Quisano. Moreover, the materials in the LVMPD case file and the evidence vault are not limited to materials that are discoverable under NRS 174.235, *Brady*, and *Giglio*. And, prior to the entry of Quisano's guilty plea, the State both frequently

referenced the policy and invited Quisano to review the State's case file, LVMPD's case file, and the evidence vault. These facts lead to the inescapable conclusion that the State's discovery policy constituted an open-file policy.[11]

Having held that the State's discovery policy constitutes an open-file policy, we next consider whether the prosecutor violated the policy by failing to disclose the affidavit.

In *McKee*, the Nevada Supreme Court addressed whether a prosecutor's open-file policy gives rise to a duty to disclose all inculpatory and exculpatory evidence. 112 Nev. at 647-48, 917 P.2d at 943-44. There, the prosecutor professed to have an open-file policy but withheld an inculpatory photograph from the defense. *Id.* at 647, 917 P.2d at 943. At trial, the prosecutor revealed the photograph, using it to impeach the defendant after he testified. *Id.*

---

[11]Our dissenting colleague asserts that the State's discovery policy is one of an administrative agency within the executive branch and that this court lacks the constitutional authority to interpret such a policy. But the record contradicts our dissenting colleague's assertion. As previously noted, the record contains several Receipt of Copy forms. Those forms, which required a signature from both the prosecutor and Quisano's counsel, contemplated a contractual agreement, and the State acted in accordance with that agreement to the extent it routinely disclosed discovery to Quisano. We are not concerned, therefore, with a general "office policy" at the Clark County District Attorney's office, and our analysis does not raise a "constitutional question," as our dissenting colleague suggests. Instead, we are giving effect to a contractual agreement on discovery between Quisano and the prosecutor. And, in interpreting the content and meaning of the open-file policy set forth in that agreement, we apply the ordinary contract principles that appellate courts routinely employ in the criminal context when interpreting plea agreements. *See State v. Crockett*, 110 Nev. 838, 842, 877 P.2d 1077, 1079 (1994) (explaining that plea agreements are subject to contract principles).

In considering whether the prosecutor engaged in misconduct by failing to disclose the photograph, the Nevada Supreme Court acknowledged that "[p]rosecutors are put in the precarious position of having to pursue criminal convictions zealously, while at the same time, insure that defendants receive a fair and impartial trial." *Id.* However, the court in *McKee* heavily emphasized the importance of securing a just conviction:

> Even more egregious, however, are attempts by representatives of the government to resort to these reprehensible means to shortcut their responsibility to ferret out all admissible evidence and use only that to meet their burden of proof. We fear resort to such conduct indicates either an absence of sufficient evidence to convict or reflects shoddy government efforts that have failed to unearth admissible evidence. . . . He has no obligation to win at all costs and serves no higher purpose by so attempting. Indeed, "[i]t is as much a duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." [*Berger v. United States*, 295 U.S. 78, 88, (1934).]

*Id.* at 647, 917 P.2d at 943-44 (citation omitted). And, looking to principles of contract law, the court cited several cases involving the State's failure to comply with the terms of a plea agreement, *McKee*, 112 Nev. at 648, 917 P.2d at 944, including *Citti v. State*, where the court held that "[w]hen the State enters a plea agreement, it is held to the most meticulous standards of both promise and performance. . . . The violation of the terms or the spirit of the plea bargain requires reversal." 107 Nev. 89, 91, 807 P.2d 724, 726 (1991) (internal quotation marks omitted).

Based on these principles, the supreme court concluded "that a prosecutor, as the agent of the State, is held to a high ethical standard and

must abide by the promises he makes." *McKee*, 112 Nev. at 648, 917 P.2d at 944. Thus, the supreme court reasoned that the open-file policy created an expectation that the prosecutor would disclose all available evidence—whether inculpatory or exculpatory—and the defendant reasonably relied on that policy. *Id.* The court concluded the prosecutor's "act of deception was clearly unfair, and extremely prejudicial to [the defendant]," and therefore, the court determined that the prosecutor engaged in misconduct. *Id.*; *cf. Furbay v. State*, 116 Nev. 481, 487-88, 998 P.2d 553, 557 (2000) (concluding that the State did not violate the defendant's rights by failing to disclose inculpatory evidence where the district attorney's office did not maintain an open-file policy).

In this case, the State contends that the duty set forth by the Nevada Supreme Court in *McKee* does not extend through sentencing. While *McKee* holds that an open-file policy subjects the State to a duty to disclose all inculpatory and exculpatory evidence in its possession to the defendant, the case does not provide guidance regarding the duration of that duty. However, the Nevada Supreme Court's decision in *Floyd v. State*, 118 Nev. 156, 42 P.3d 249 (2002), *abrogated on other grounds by Grey v. State*, 124 Nev. 110, 178 P.3d 154 (2008), is informative on the issue. *Floyd* concerned the application of two discovery statutes to the penalty phase of a capital murder trial—specifically, NRS 174.234 and NRS 174.245. *Id.* at 167, 42 P.3d at 257. Taken together, these statutes provide that where a party intends to call a witness or offer certain materials during its case in chief, it must disclose to the opposing party, before trial, information relating to the witness and permit an opportunity to inspect and copy the materials. *Id.* The case presented the question of whether the phrase "case in chief," as used in NRS 174.234 and NRS

174.245, encompasses the penalty phase of a capital murder trial. *Id.* at 168, 42 P.3d at 257. In considering the issue, the Nevada Supreme Court characterized as "unfounded" the assumption that the term "case in chief" does not include both the guilt phase and penalty phase of a capital murder trial. *Id.* The *Floyd* court concluded that "the term 'case in chief[,]' [as used in those statutes,] encompasses the initial presentation of evidence by either party in the penalty phase of a capital trial." *Id.* at 169, 42 P.3d at 258.

This reasoning in *Floyd* is illuminating on the present issue, as it strongly implies that a duty to disclose evidence does not dissipate at the end of the guilt phase of a trial, but remains in force until the proceedings fully conclude in the trial court. And, capital cases do not present the only situation in which the State provides discovery to defendants specifically for use at sentencing. In cases involving enhanced penalties, such as DUI, domestic violence, and habituality, the State routinely gives defendants discovery that may be applicable only to sentencing. *See* NRS 484C.400(2); NRS 200.485(4); NRS 207.016(2). This type of discovery is generally inculpatory in nature, yet the State discloses these materials for their admission or for argument at sentencing as opposed to their utilization during trial.

This disclosure of discovery, which pertains exclusively to sentencing, reflects an underlying recognition that defendants must have an opportunity to review materials in order to prepare a defense for sentencing proceedings, and it enhances judicial efficiency by averting delays caused by the offer of surprise evidence. *See* NRS 169.035 (explaining that the criminal procedure statutes are "intended to provide for the just determination of every criminal proceeding" and providing

that such statutes shall be "construed to secure simplicity in procedure, fairness in administration and the elimination of unjustifiable expense and delay"). As discovery materials are not limited to those materials intended for use at trial, it follows that for purposes of the duty to disclose under *McKee*, there is no basis to distinguish between trial and sentencing proceedings in a noncapital case.

The Nevada Supreme Court's reasoning in *McKee* rests on the principle that if the State professes to disclose all evidence in its possession, the defendant may reasonably rely on that promise. 112 Nev. at 648, 917 P.2d at 944. Because at sentencing the State may argue facts contained within discovery that ultimately could have a significant impact on a defendant's sentence, it follows that a defendant's reliance on an open-file policy following entry of a guilty or no contest plea or after a jury verdict continues until sentencing concludes. *See Miller v. Hayes*, 95 Nev. 927, 929, 604 P.2d 117, 118 (1979) (holding the district court's jurisdiction over the defendant continues until the judgment becomes final).

Moreover, in the context of penalty or sentencing proceedings, it is reasonable for a defendant to rely on an open-file policy where the policy does not state that discovery "concludes upon the defendant entering his guilty plea," but rather explicitly provides that "[t]his invitation *is ongoing*," and where, as here, the record reflects that the State regularly filed Receipt of Copy forms with the district court.[12] These actions demonstrate that the State acted in accordance with its open-file

---

[12]Our dissenting colleague's ultimate conclusion rests in part on the assertion that the prosecutor believed that the open-file policy only extended through trial and not through sentencing, but the record is completely devoid of any factual finding in support of that assumption.

policy on an *ongoing basis* throughout the proceedings. Therefore, a defendant would reasonably expect such discovery disclosures to continue until the judgment becomes final. Thus, for the reasons stated, we hold that the duty set forth in *McKee* extends through entry of the judgment of conviction.[13]

In the present case, the State maintained an open-file policy and was subject to an ongoing duty to disclose all evidence in its possession to Quisano. In light of the State's open-file policy, repeated references to that policy, and regular discovery disclosures, Quisano could reasonably rely on the State's promise under the open-file policy to provide discovery as it became available, just like the defendant in *McKee* who reasonably relied on the State's open-file policy.[14] Yet, similar to the prosecutor in *McKee* who failed to disclose a photograph before introducing

---

[13]Our decision today does not address law enforcement materials that the State is restricted from disclosing under federal or state law—for example, National Crime Information Center (NCIC) records. *See, e.g.*, 28 U.S.C. § 534(b) (2011). Neither does our decision address materials that fall within an evidentiary privilege.

[14]Based on the record in the present case, the extent to which Quisano relied on the State's open-file policy is unclear. But a defendant's reliance on an open-file policy is not a prerequisite to the duty to disclose as set forth in *McKee*. Instead, the reality that a defendant *may* rely on an open-file policy is the rationale underlying the supreme court's conclusion "that a prosecutor, as the agent of the State, is held to a high ethical standard and must abide by the promises he makes." *McKee*, 112 Nev. at 648, 917 P.2d at 944; *see also Furbay*, 116 Nev. at 487, 998 P.2d at 557 (2000) (concluding that "[w]hen the prosecution purports to give all inculpatory evidence in its control, it may not withhold evidence for later use"). Because the duty to disclose arises when the State professes to have an open-file policy, we need not reach the issue of whether Quisano actually relied on the State's open-file policy.

it at trial, here also, the prosecutor failed to disclose the affidavit to Quisano prior to using it at Quisano's sentencing hearing. Because the prosecutor withheld the affidavit from Quisano in violation of the open-file policy, the prosecutor engaged in misconduct. *See McKee*, 112 Nev. at 648, 917 P.2d at 944 (concluding that the prosecutor engaged in misconduct by failing to comply with an open-file policy).

In characterizing the prosecutor's violation of the open-file policy as misconduct, we are constrained by the prosecutorial misconduct standard applied in *McKee* and by the district court's comments regarding the prosecutor anticipating Rodrigues appearing at sentencing on behalf of Quisano.[15] But we are also mindful of the realities confronting today's prosecutors—including high case volumes and differing case management systems—and recognize that a prosecutor's failure to provide discovery may be a mere unintentional oversight as opposed to a willful or intentional act involving misconduct. Thus, we encourage district courts, when imposing sanctions for a violation of an open-file policy, to make factual findings on the record with regard to whether such a violation was inadvertent, willful, or intentional. Without a factual finding that a violation of an open-file policy was willful or intentional, this court is reluctant to classify an unintentional violation as *misconduct* on the part of the prosecutor.

Unlike in *McKee*, where the prosecutor prejudiced the defendant by impeaching him with the undisclosed photograph, here,

---

[15]Specifically, in reference to the prosecutor's copy of the affidavit, the district court observed that "he probably has it all nice and highlighted in his file because he may have anticipated that [Rodrigues] would just show up."

Quisano did not suffer prejudice when the prosecutor impeached Rodrigues with the undisclosed affidavit.[16] First, the district court sustained Quisano's objection after the State asserted, "you went to court one time and asked for one thing, and you're coming to court now and asking for the complete opposite." Second, at sentencing, the State did not rely on its impeachment of Rodrigues, but rather argued that Quisano had a prior record of child abuse against Khayden, and in the present case, Khayden suffered injuries consistent with child abuse. Third, the district court did not place value on the affidavit, which was merely marked as a court exhibit, but rather, expressly stated that it found Quisano's history of child abuse in Hawaii particularly influential in its sentencing determination. Fourth, and most important, the district court sentenced Quisano in accordance with the guilty plea agreement. The failure to disclose the affidavit, although a violation of the State's open-file policy, did not ultimately prejudice Quisano or result in a miscarriage of justice. *Valdez*, 124 Nev. at 1190, 196 P.3d at 477 (holding that reversal is not warranted under the plain-error standard unless the error affects the

---

[16]Although Quisano raised a general objection that the State violated discovery rules, he did not use the precise words "the State violated its open-file policy," and the district court did not rule on that issue. As such, we review for plain error because Quisano may not have sufficiently raised an objection based on the violation of the open-file policy. *See Valdez v. State*, 124 Nev. 1172, 1190, 196 P.3d 465, 477 (2008) (holding that unpreserved claims of prosecutorial misconduct are subject to plain-error review). Even if error is plain from a review of the record, we will not reverse Quisano's sentence under that standard unless Quisano "demonstrates that the error affected his . . . substantial rights, by causing 'actual prejudice or a miscarriage of justice.'" *See id.* (quoting *Green v. State*, 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)).

Court of Appeals
OF
Nevada

(O) 1947B

defendant's substantial rights). Therefore, reversal of Quisano's sentence is not warranted on this basis.[17]

---

[17]Even if this court assumed that Quisano's objection at sentencing was sufficient to preserve the open-file policy issue for review under the harmless-error standard, Quisano's claim would nevertheless fail, as the State's failure to disclose the affidavit neither prejudiced Quisano nor affected the district court's sentencing determination. *See Valdez*, 124 Nev. at 1188-89, 196 P.3d at 476 (setting forth the harmless-error standard for nonconstitutional error); *see also McKee*, 112 Nev. at 648, 917 P.2d at 944 (reviewing a prosecutor's failure to comply with an open-file policy for nonconstitutional harmless error where the appellant properly preserved the issue for appellate review).

Quisano further contends that the State was required to disclose the affidavit under NRS 174.235 and the district court's order compelling discovery, and therefore, he asserts that the district court abused its discretion by permitting the State to cross-examine Rodrigues using the affidavit. Even if we assume that NRS 174.235 or the discovery order required the State to disclose the affidavit, Quisano would not be entitled to relief because the facts in the present case do not establish that the State's failure to disclose the affidavit prejudiced Quisano and because Quisano does not otherwise argue that the State acted in bad faith. *See Evans v. State*, 117 Nev. 609, 638, 28 P.3d 498, 518 (2001) ("The district court has broad discretion in fashioning a remedy" for discovery violations, and reversal is not appropriate "absent a showing that the State acted in bad faith or that the nondisclosure caused substantial prejudice to the defendant which was not alleviated by the court's order.").

We also note that the record does not support the State's assertion that it did not intend to use Rodrigues as a witness. Based on the DFS employee's efforts to memorialize Rodrigues' statements at the family court proceeding, shortly before Quisano's plea, it appears that the State intended to impeach Rodrigues at Quisano's trial. Moreover, as the DFS employee summarized Rodrigues' testimony in an affidavit following entry of Quisano's plea, but before sentencing, it appears that the State anticipated that Rodrigues would provide an oral statement on behalf of Quisano at sentencing. Tellingly, at Quisano's sentencing, the district

*continued on next page...*

*Electronic coverage of Quisano's sentencing hearing*

Quisano argues that this court should remand his case for a new sentencing hearing because the district court erred by permitting a reporter from the *Las Vegas Review-Journal* newspaper to electronically record his sentencing hearing where the media outlet did not file a timely request for permission and where the district court did not issue a written order or make particularized findings on the record. The State argues that the district court did not err because courts may grant untimely requests to provide electronic coverage of courtroom proceedings and because courts need not make explicit findings regarding the factors set forth in SCR 230(2) on the record.

A district court's failure to follow the procedural requirements for determining whether to permit electronic coverage of courtroom proceedings amounts to nonconstitutional error, which we review for harmless error. *See* NRS 178.598 ("Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."). Under that standard, we will not reverse unless the error substantially influenced the district court's sentencing determination or had an injurious effect on the defendant's sentence. *See Knipes v. State*, 124 Nev. 927, 935, 192 P.3d 1178, 1183 (2008) (concluding that the failure to apply the procedural safeguards for juror questioning constitutes nonconstitutional error and applying the federal test set forth in *Kotteakos v. United States*, 328 U.S. 750 (1946)).

---

*...continued*

court observed that the affidavit was "nicely highlighted. I suspect they thought maybe [Rodrigues] would be showing up to speak."

We recognize that the presence of cameras in the courtroom can be a controversial topic, and without adequate safeguards, a camera's presence may violate a criminal defendant's right to due process. The United States Supreme Court, however, has refused to create a per se constitutional rule against electronic coverage of courtroom proceedings. *See Chandler v. Florida*, 449 U.S. 560, 573, 582-83 (1981). In *Chandler*, the Court reasoned that technological advancements had limited the degree to which cameras disrupt courtroom proceedings and that states had enacted safeguards to protect against the dangers identified by earlier caselaw. *Id.* at 576-77.

The procedural requirements set forth in SCR 230 are examples of safeguards that serve to protect a criminal defendant's constitutional rights by ensuring that district courts properly balance a defendant's constitutional right to a fair trial with the media's and public's interest in electronic coverage of courtroom proceedings. *See Chandler*, 449 U.S. at 577 (recognizing that a trial court's consideration, on the record, of a defendant's objection to media coverage functions as a safeguard of the defendant's constitutional rights). Under SCR 230(2), courtroom proceedings that are open to the public are presumptively subject to electronic coverage. Participants in a courtroom proceeding need not consent to electronic coverage. SCR 240(1). But media outlets desiring to cover a courtroom proceeding by electronic recording or photography must file a written request with the court at least 24 hours before the proceeding commences. SCR 230(1). The district court, however, may grant a request to provide electronic coverage "on shorter notice or waive the requirement for a written request" entirely. *Id.*

Under SCR 230(2), "[a] judge shall make particularized findings on the record when determining whether electronic coverage will be allowed." Specifically, the court must consider the following six factors:

> (a) [t]he impact of coverage upon the right of any party to a fair trial; (b) [t]he impact of coverage upon the right of privacy of any party or witness; (c) [t]he impact of coverage upon the safety and well-being of any party, witness or juror; (d) [t]he likelihood that coverage would distract participants or would detract from the dignity of the proceedings; (e) [t]he adequacy of the physical facilities of the court for coverage; and (f) [a]ny other factor affecting the fair administration of justice.

SCR 230(2). The court must also make its written order "a part of the record of the proceedings." SCR 230(1).

In the present case, the district court permitted the *Las Vegas Review-Journal* to provide electronic coverage of Quisano's sentencing hearing even though the media outlet did not timely file a request for permission—a determination expressly authorized by SCR 230(1). The district court, however, failed to follow the procedure set forth in SCR 230 for granting or denying requests to provide electronic coverage of courtroom proceedings. During Quisano's sentencing hearing, the district court considered potential prejudice by media coverage to Quisano, analyzed the public's benefit stemming from media coverage of the courtroom proceeding, and examined the adequacy of the physical facilities of the court for coverage. But the district court did not make particularized findings on the record regarding all of the factors set forth in SCR 230(2), and it did not issue a written order granting the outlet's request.

By failing to comply with these requirements, the district court erred, but the error was harmless. Nothing in the record suggests that the district court's error contributed to its sentencing determination, nor does Quisano argue such was the case. *See Knipes*, 124 Nev. at 935, 192 P.3d at 1183. In fact, Quisano acknowledged that the presence of a reporter from the *Las Vegas Review-Journal* with a camera in the courtroom did not prejudice him.

Moreover, we agree with the district court's rationale for granting the request of the *Las Vegas Review-Journal*. In particular, we note the potential benefit to the public associated with electronic coverage of courtroom proceedings. Those benefits include (1) access to and knowledge of the justice system; (2) public oversight of the judicial process, which curtails judicial abuse and enhances public confidence in the judicial system; (3) increased awareness of societal problems, including domestic violence and child abuse; and (4) protection of defendants' rights. *See Allowing Cameras and Electronic Media in the Courtroom: Hearing on S. 721 Before the Subcomm. on Admin. Oversight and the Courts of the S. Comm. on the Judiciary*, 106th Cong. 19, 30 (2000) (statements of Judge Nancy Gertner, United States District Court for the District of Massachusetts, and Sen. Charles E. Schumer). Therefore, we conclude that Quisano's argument fails.

## CONCLUSION

Because the State maintained an open-file policy, it was subject to a duty, which extended through entry of the judgment of conviction, to disclose all evidence in the State's possession, regardless of whether it was inculpatory or exculpatory. The prosecutor failed to disclose the affidavit notwithstanding that duty, and therefore, he engaged in misconduct. The misconduct, however, did not prejudice

Court of Appeals
of
Nevaoa

(O) 1947B

Quisano because the district court did not rely on the affidavit in sentencing Quisano and sentenced Quisano in accordance with the guilty plea agreement.

As to his two remaining arguments, Quisano failed to establish reversible error. First, the prosecutor's failure to disclose the affidavit did not violate *Brady* because the affidavit was not favorable to Quisano. Second, although the district court erred by failing to make particularized findings on the record regarding all of the factors set forth in SCR 230(2), and by failing to enter a written order granting the *Las Vegas Review-Journal* permission to provide electronic coverage of Quisano's sentencing hearing, the district court's error was harmless because it did not contribute to the sentencing determination. Accordingly, we affirm the judgment of conviction and sentence.

_____, J.
Silver

I concur:

_____, C.J.
Gibbons

Court of Appeals
of
Nevada

(O) 1947B

COURT OF APPEALS
OF
NEVADA

(O) 1947B

TAO, J., concurring in part and dissenting in part:

I agree with much that the majority writes, including the portion of the opinion affirming the district court's decision to permit news reporters to cover Quisano's sentencing hearing. Unfortunately, I cannot join in the portion of its analysis relating to the scope and applicability of the prosecutor's "open-file policy."

The majority judicially interprets the prosecutor's open-file policy so that it now must be understood to apply not only to trial (which is what the particular prosecutor in this case apparently understood it to mean), but from now on to also extend beyond the determination of guilt until entry of the judgment of conviction. The majority proffers this interpretation as a matter of law, not based upon factual findings (as the district court heard no sworn testimony or evidence and entered no factual findings), and furthermore it does so on appeal de novo without deference to the district court or to the prosecutor who wrote the policy.

As an exercise in public policy, the majority's reading of the open-file policy probably has much in it to commend; one could argue that there exist sound and good reasons why elected district attorneys in this state should adopt voluntary open-file discovery policies that are both generous and extend through the completion of sentencing, not just through trial. *See* Alex Kozinski, *Criminal Law 2.0*, 44 Geo. L.J. Ann. Rev. of Crim. Proc. viii (2015) ("There is reason to doubt that prosecutors comply with [their] obligations fully."). Indeed, former Chief Judge Kozinski of the United States Court of Appeals for the Ninth Circuit, certainly no liberal firebrand, has written of an "epidemic of *Brady* violations abroad in the land." *United States v. Olsen*, 737 F.3d 625, 626 (9th Cir. 2013) (Kozinski, C.J., dissenting). Whether or not that epidemic

truly exists or has spread to Nevada, requiring more disclosure in criminal cases beyond the requirements of *Brady* and *Giglio* might well represent good policy, even if only as a preventative measure against future abuse. It's possible, perhaps even likely, that with broader prosecutorial open-file discovery policies and more presentencing discovery, *Brady* violations may be more infrequent, criminal trials may be more free of error, and sentences might be more appropriately tailored to the defendant and the crime. *See id. But see* Brian P. Fox, Note, *An Argument Against Open-File Discovery in Criminal Cases*, 89 Notre Dame L. Rev. 425, 428 (2013) (arguing that "open-file discovery would serve no actual purpose in eliminating . . . prosecutorial misconduct").

But the problem here is that, even if all of these things are true, the question before us is not whether this approach represents good policy; the only question that should matter to us is whether it represents good law. The majority reasons that because several statutes (NRS 174.234, NRS 174.245, NRS 484C.400(2), NRS 200.485(4), and NRS 207.016(2)) require the State to provide certain types of discovery in connection with certain types of sentencing proceedings in certain types of criminal cases, the prosecutor's open-file policy should be interpreted to require the same thing in other types of cases not covered by those statutes. But merely because the Legislature has imposed presentencing discovery obligations upon prosecutors in some cases does not mean that those obligations govern prosecutors in other cases that the Legislature chose not to address. If anything, it suggests the exact opposite: that the Legislature did not intend to create a general rule governing presentencing discovery in all criminal cases.

So the court's holding today does not originate in any statute. Instead, to reach its conclusion, the majority interprets the meaning of the prosecutor's open-file policy as a question of law in the same way that the Nevada Supreme Court has interpreted the meaning of criminal discovery statutes. But prosecutorial policies are not legislative statutes, and the two things cannot be interpreted using the same methods. I diverge from the majority because its analysis of the open-file policy raises a serious constitutional question regarding the power of the judiciary to "interpret" (or "construct") the meaning of a prosecutorial policy against the intentions of its author. Unlike my colleagues, I do not think that we have any such power, and therefore, I do not think we can legitimately make the prosecutor's open-file policy mean what the majority does.

The proper place to begin is by considering the limits of our judicial power. As an intermediate appellate court, our freedom of action in resolving a particular case is bounded on many sides. Above, our power is constrained by existing precedent of the Nevada Supreme Court under principles of stare decisis. *Hubbard v. United States*, 514 U.S. 695, 718, 720 (1995) (Rehnquist, C.J., dissenting) (stare decisis "applies *a fortiori* to enjoin lower courts to follow the decision of a higher court"). Below, we are limited by the issues actually raised, argued, and disposed of before the district court. *See Old Aztec Mine, Inc. v. Brown*, 97 Nev. 49, 52, 623 P.2d 981, 983 (1981) ("A point not urged in the trial court, unless it goes to the jurisdiction of that court, is deemed to have been waived and will not be considered on appeal."); *State v. Wade*, 105 Nev. 206, 209 n.3, 772 P.2d 1291, 1293 n.3 (1989) ("This court will not consider issues raised for the first time on appeal."). Our review in many cases is further limited by the factual findings made by the district court, which we cannot second-guess

absent clear error, the existence of which should only rarely be found. *See Somee v. State*, 124 Nev. 434, 187 P.3d 152 (2008).

Additionally, in our tri-partite system of government, wherever the other coequal branches of government have chosen to act, we must accord deference to them on any issue that lies within their constitutional power to address. *See* Nev. Const. art. 3, § 1(1) ("The powers of the Government of the State of Nevada shall be divided into three separate departments,—the Legislative,—the Executive and the Judicial; and no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any functions, appertaining to either of the others, except in the cases expressly directed or permitted in this constitution."). *See generally Beazer Homes Nev., Inc. v. Eighth Judicial Dist. Court*, 120 Nev. 575, 578 n.4, 97 P.3d 1132, 1134 n.4 (2004) ("When a statute is clear, unambiguous, not in conflict with other statutes and is constitutional, the judicial branch may not refuse to enforce the statute on public policy grounds. That decision is within the sole purview of the legislative branch."); *City of Las Vegas v. Eighth Judicial Dist. Court*, 118 Nev. 859, 867, 59 P.3d 477, 483 (2002) (invalidating vague statute because, to enforce it, "this court would have to engage in judicial legislation and rewrite the statute substantially"), *abrogated on other grounds by State v. Castaneda*, 126 Nev. 478, 245 P.3d 550 (2010). This deference applies equally to the Legislative and Executive branches.[1] *See Holiday Ret. Corp. v. State, Div. of Indus.*

---

[1]At least on civil matters, an administrative agency cannot interpret a criminal law because criminal statutes "are for courts, not for the Government, to construe." *Abramski v. United States*, ___ U.S. ___, ___, 134 S. Ct. 2259, 2274 (2014). *See Esquivel-Cantana v. Lynch*, ___ F.3d ___,
*continued on next page...*

*Relations*, 128 Nev. 150, 154, 274 P.3d 759, 761 (2012) ("It is the prerogative of the Legislature, not this court, to change or rewrite a statute."); *State, Div. of Ins. v. State Farm Mut. Auto. Ins. Co.*, 116 Nev. 290, 293, 995 P.2d 482, 485 (2000) (courts give great deference to executive branch agency decisions). *See generally United States v. Armstrong*, 517 U.S. 456, 464 (1996) ("[A] presumption of regularity supports . . . prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (internal citations and quotation marks omitted)). And of course overarching everything is the Nevada Constitution, which created the judicial branch and defines, as well as limits, its power to do anything in any civil or criminal case. *See* Nev. Const, art. 6. *See generally* John G. Roberts, Jr., Comment, *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1230 (1993) ("Separation of powers is a zero-sum game. If one branch unconstitutionally aggrandizes itself, it is at the expense of the other branches."); Antonin Scalia, *The Doctrine of Standing as an Essential Element of the Separation of Powers*, 17 Suffolk U.L. Rev. 881, 881 (1983) (recognizing that going beyond recognized judicial limits "will inevitably produce—as it has during the past few decades—an overjudicialization of the processes of self-governance").

---

...*continued*
___, 2016 WL 192009 (6th Cir. 2016) (Sutton, J., concurring in part and dissenting in part) (stating that "the federal courts have never presumed that, when an ambiguity arises in a criminal statute, the congressional silence signals that Congress wants an executive-branch agency to fill the gap"). The prosecutor's open-file policy is not itself either a criminal law or an interpretation of a criminal statute.

It seems to me that deciding what a prosecutor's open-file policy should say, and what prosecutors are required to do under it, is an exercise of a fundamentally prosecutorial (executive) function, and I wonder whether we have any (judicial) power to make it mean what the majority does when we have no evidence (literally none, as the district court did not conduct an evidentiary hearing) that the district attorney who wrote it intended to give it that meaning.

Let's define exactly what is at stake here. Under Nevada law, the elected district attorney is the public prosecutor within each county. NRS 252.080. The Legislature has delegated limited "policymaking authority" to each district attorney to govern the affairs of its own office. *See* NRS 252.070(1) (referring to "policymaking authority for the office of the district attorney"). The open-file policy here was adopted by the Clark County District Attorney but not formally made into a regulation under NRS Chapter 233B, the Nevada Administrative Procedures Act. Therefore, it does not constitute an administrative regulation that would have the force and effect of Nevada law. *See State ex rel. Nev. Tax Comm'n v. Saveway Super Serv. Stations, Inc.*, 99 Nev. 626, 630, 668 P.2d 291, 294 (1983) ("A properly adopted substantive rule establishes a standard of conduct which has the force of law.").

Consequently, the open-file policy at issue here is not a public statute or administrative regulation; it is a unilaterally revocable office policy voluntarily adopted by the Clark County District Attorney to govern how its staff prosecutors handle criminal prosecutions. *See Kyles v. Whitley*, 514 U.S. 419, 437 (1995). The decision to adopt an open-file policy belongs to the district attorney; it's an exercise of executive branch prosecutorial power that courts generally have limited power to second-

guess. A court cannot force a prosecutor to adopt a policy if he does not want one; that decision is his alone to make in the exercise of his judgment as an elected official. *See id.* (stating that the United States Constitution does not "demand" that prosecutors adopt open-file policies).

Normally, courts are required to give deference to an executive branch agency that acts within its constitutional power, such as when it enacts or interprets administrative regulations pursuant to Nevada's Administrative Procedures Act, NRS Chapter 233B. *See State, Div. of Ins. v. State Farm Mut. Auto. Ins. Co.*, 116 Nev. 290, 293, 995 P.2d 482, 485 (2000) ("When determining the validity of an administrative regulation, courts generally give 'great deference' to an agency's interpretation of a statute that the agency is charged with enforcing."); *State Indus. Ins. Sys. v. Miller*, 112 Nev. 1112, 1119, 923 P.2d 577, 581 (1996) ("An administrative agency such as SIIS, charged with the duty of administering an act, is impliedly clothed with power to construe the relevant laws and set necessary precedent to administrative action. The construction placed on a statute by the agency charged with the duty of administering it is entitled to deference." (quoting *State Indus. Ins. Sys. v. Snyder*, 109 Nev. 1223, 1228, 865 P.2d 1168, 1171 (1993))). Similar deference exists when an executive branch agency adjudicates administrative grievances over which it has statutory jurisdiction. *See Bisch v. Las Vegas Metro. Police Dep't*, 129 Nev. ___, ___, 302 P.3d 1108, 1115 (2013).

Because we must give deference when an agency creates, interprets, or adjudicates formal administrative regulations that have the force and effect of law, I assume *a fortiori* that we must give similar deference (and perhaps even more) when the agency enacts something less

than a formal administrative regulation, such as a voluntary office discovery policy. The United States Court of Appeals for the District of Columbia has described a federal executive agency policy as follows:

> An agency policy statement does not seek to impose or elaborate or interpret a legal norm. It merely represents an agency position with respect to how it will treat—typically enforce—the governing legal norm. By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach. The agency retains the discretion and the authority to change its position—even abruptly— in any specific case because a change in its policy does not affect the legal norm. We thus have said that policy statements are binding on neither the public nor the agency.

*Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) (internal citations omitted). This seems an apt description of (or at least analogue to) a Nevada prosecutor's open-file policy: something less than a formal statute or regulation that can be retracted or rewritten as the district attorney pleases. Because it is such a thing, I think a serious question exists as to whether courts organized under Article VI have any power to judicially "interpret" it as a question of law in the way that courts can interpret a statute enacted by the Legislature or an administrative regulation enacted under the Administrative Procedures Act. Thus, the majority's unspoken premise—that we have the judicial power to make the open-file policy extend through sentencing despite having no evidence that the district attorney intended that—may be seriously flawed.[2]

---

[2]If we had the power to interpret a mere policy in the same manner as we could a statute—as a question of law rather than fact and by using the same rules of interpretation that we would apply to a statute—an

*continued on next page...*

That is not to say, however, that courts never have any power whatsoever over executive branch policies. Although the branches of government are separate and coequal, there are areas where, much like the circles of a Venn diagram, the constitutional powers belonging to two branches can sometimes overlap. For example, if a prosecutor's employment were terminated because he allegedly violated an office policy and he challenged the termination in court as illegal under Nevada employment law, the questions of whether the employer complied with the policy, and whether the policy complied with the law, would become ours to resolve. *See generally Terry v. Sapphire's Gentlemen's Club*, 130 Nev. ___, 336 P.3d 951 (2014). Similarly, if an executive branch agency fails to follow its own regulations, the failure may sometimes implicate due process concerns. *See Woodard v. Los Fresnos Indep. Sch. Dist.*, 732 F.2d 1243, 1245 (5th Cir. 1984) (recognizing that the failure of an agency to follow each and every regulation is not per se a denial of due process in

---

*...continued*

interesting argument exists that the open-file policy might be read to apply through sentencing. The open-file policy here states that the discovery obligations imposed by it are "ongoing." "Ongoing" is commonly defined as follows: "continuing without termination or interruption," *Random House Unabridged Dictionary* (2d ed. 1993), or "continuing to exist, happen, or progress: continuing without reaching an end," *Merriam-Webster Online Dictionary* (2015). Thus, the prosecutor's discovery obligations are "ongoing," which, if we could engage in textual analysis, we could conclude means that they do not end until the case is over, and therefore, they do apply through sentencing. But that puts the cart before the horse, because I am not sure we have the power to do that, or even if we did, we necessarily would do so as a question of law, or that we would interpret the policy by using the same rules of textual analysis that we would apply to a legislative enactment, or that we could engage in this analysis on appeal in a de novo manner.

every instance, but it is when the regulation was required to be implemented in order to satisfy the constitution); *Derrickson v. Bd. of Educ.*, 703 F.2d 309, 315 (8th Cir. 1983) ("We agree that a state agency's failure to follow its own ordinances or regulations may constitute a deprivation of property without due process."). *See generally Wyman v. State*, 125 Nev. 592, 600, 217 P.3d 572, 578 (2009) (Nevada's due process clause is coextensive with the Due Process Clause of the United States Constitution).

Numerous other examples of this overlap exist; most relevant here is that where an executive branch policy affects the way a criminal case is prosecuted in court (and open-file discovery policies clearly do that), it overlaps with the province of the judiciary, and courts possess some constitutional power to ensure that the policy does not harm the integrity of a judicial proceeding or result in fundamental unfairness. *See United States v. Armstrong*, 517 U.S. 456, 464 (1996) (providing that if prosecutor's policy constitutes improper race-based "selective prosecution," resulting charges can be dismissed and conviction can be reversed); *Salaiscooper v. Eighth Judicial Dist. Court*, 117 Nev. 892, 902-03, 34 P.3d 509, 516-17 (2001) ("selective prosecution" may violate the equal protection clause).

Within this overlapping area, the court possesses some power to regulate the meaning and operation of a prosecutorial policy. But, broadly speaking, that power is conventionally exercised in one of a few discrete ways:[3] first, a court can invalidate (or refuse to enforce) an

---

[3]There are others: for example, if an executive branch agency engages in illegal behavior, a court can issue an injunction or writ prohibiting the behavior from continuing or resuming under pain of

*continued on next page...*

executive branch policy that is illegal or unconstitutional or results in fundamental unfairness during a trial. What this really means is that the court can't necessarily make the executive branch retract the policy, but it can exclude from trial any evidence obtained under the policy, and it can toss out any conviction in which the policy played a meaningful role. *See Armstrong*, 517 U.S. at 465; *see also Silvar v. Eighth Judicial Dist. Court*, 122 Nev. 289, 129 P.3d 682 (2006) (invalidating county ordinance as unconstitutionally vague).

Alternatively, the court can sanction a prosecutor, exclude evidence from trial, and void a conviction if the prosecutor intentionally violated the policy in a way that undermines the fairness of a trial. *See McKee v. State*, 112 Nev. 642, 648, 917 P.2d 940, 944 (1996) (providing that when prosecutor represented that he would comply with open-file policy but then didn't, he committed "an act of deception" that misled the defendant and warranted reversal of criminal conviction).

What a court cannot do is to write or amend laws, regulations, or policies for the other branches of government. *See Holiday Ret. Corp. v. State, Div. of Indus. Relations*, 128 Nev. 150, 154, 274 P.3d 759, 761 (2012) ("It is the prerogative of the Legislature, not this court, to change or rewrite a statute."). *See generally W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 651 (1943) (Frankfurter, J., dissenting) ("A court can only strike down. It can only say 'This law or that law is void.' It cannot modify . . . .").

---

*...continued*
contempt. But since those powers do not relate to the instant case, and there is no allegation that the open-file policy here is illegal, these broad categories will suffice to demonstrate my point.

The interesting question here is whether the court possesses another power: to interpret the meaning of an executive branch policy as a matter of law de novo, in the same way that it can interpret a legislative enactment. I would say that the answer is unclear at best; no published Nevada Supreme Court case has ever purported to interpret, according to the rules of interpretation normally applied to statutes, the meaning of an executive branch policy that is less than a law or regulation.[4] And, even if such a theoretical power existed, I am not sure what rules of interpretation would apply. The normal rules of statutory interpretation are that the plain words of a statute govern unless they are ambiguous. *See State v. Catanio*, 120 Nev. 1030, 1033, 102 P.3d 588, 590 (2004) ("We must attribute the plain meaning to a statute that is not ambiguous." (citing *Firestone v. State*, 120 Nev. 13, 16, 83 P.3d 279, 281 (2004)). Upon a finding of ambiguity, the court's task then becomes to assess the intent of the drafter, not to rewrite the policy into something different that the court might think is better but the drafter did not intend. *See Beazer Homes Nev., Inc. v. Eighth Judicial Dist. Court*, 120 Nev. 575, 580, 97 P.3d 1132, 1135 (2004) ("In construing an ambiguous statute, we must give the statute the interpretation that reason and public policy would indicate the

---

[4]The cases principally relied upon by the majority are *Floyd v. State*, 118 Nev. 156, 42 P.3d 249 (2002), and *McKee v. State*, 112 Nev. 642, 917 P.2d 940 (1996). But neither case says anything about the power of a court to "interpret" the meaning of a voluntary policy that is not a law or regulation. *Floyd* was an exercise in the interpretation of two ambiguous statutes, namely, NRS 174.234 and NRS 174.245, which the Nevada Supreme Court held extend through the sentencing phase of a death-penalty case. *McKee* simply held that a prosecutor commits an "act of deception" when he misleads a defendant by promising to comply with a policy, but then does not.

legislature intended." (internal quotation marks and citation omitted)); *Freeman v. Davidson*, 105 Nev. 13, 16, 768 P.2d 885, 887 (1989) (providing that when interpreting statutes, "[t]he legislature's intent should be given full effect").

But when an executive branch policy does not have the force and effect of law, I am not sure why we would interpret it according to the same rules that apply to laws. And even if we could, a law is created following public legislative debate, and a regulation is created following public notice and comment, but an executive branch policy requires neither of these things. So when such a policy is ambiguous, I am not sure how we could discern the "intent of the drafter" when there is no publicly available history or debate to analyze. Thus, the answers to whether we have the power to interpret an executive branch policy as a matter of law, and how we would do it, are far from clear.

Consequently, I would not so easily assume that we have the power to engage in judicial construction of a prosecutor's policy at all. Even if we did, I would think that, at a minimum, we must do so in a way that gives considerable deference to the district attorney, rather than as a question of law de novo. *See generally Armstrong*, 517 U.S at 464 (In the federal system, "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws . . . . As a result, '[t]he presumption of regularity supports' their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." (internal citations and quotation marks omitted)). So, as long as the contents of an open-file policy end up being unambiguous and legal, decisions on such things as whether to adopt a policy at all, what it should say, and how far

it should go, belong entirely to the district attorney and represent an exercise of executive-branch power that lies outside of our power to regulate.

In this case, nobody contends that the policy violates any statute or is less protective of the defendant's right to discovery than the Constitution requires under *Brady* or *Giglio*; everyone agrees that the policy here goes much further than required by those cases. If the elected district attorney decides that its voluntary discovery policy should be broader than required, but expire before sentencing, there is little that courts can do about that so long as the policy does not violate existing law or the constitution or intrude upon judicial functions, which the policy here did not.

Thus, in this case, the content and meaning, per se, of the prosecutor's policy are none of our business and not ours to interpret. And even if they somehow were, our options would normally be limited to invalidating the policy if it were illegal, imposing a sanction if it was violated, or possibly (but far from surely) identifying the drafter's intent if it were ambiguous. But here, nobody asserts that the policy is illegal, unconstitutional, or ambiguous. Quite to the contrary, the majority specifically concludes that no due process violation occurred under *Brady* or *Giglio* and, furthermore, that no Nevada statute required the disclosure of the affidavit that the prosecutor used against Quisano. The majority does not even find the policy to be fundamentally unfair; rather, it affirms Quisano's conviction and sentence precisely because it concludes that what happened at sentencing under the existing open-file policy was not all that unfair to Quisano.

Yet the majority concludes that the policy—despite not being ambiguous, illegal, or unfair—is in need of judicial construction nonetheless. It then imposes upon it a construction as a matter of law that reflects no deference to the district attorney and is unanchored to the drafter's intention.

Where the constitutional power to do all of that comes from is entirely unclear. Perhaps one could argue that it exists under Article 3, Section 1(1) of the Nevada Constitution. But I am inclined to think it does not.

Because the majority sees things differently, I respectfully concur in much of the majority's opinion but dissent from the portion relating to the scope and meaning of the open-file policy.

_____, J.
Tao